Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN V. DOE, *Plaintiff-Appellee,* v. HOLY SEE, *Defendant-Appellant.* | No. 06-35563 D.C. No. CV-02-00430-MWM |

| | |
|---|---|
| JOHN V. DOE, *Plaintiff-Appellant,* v. HOLY SEE, *Defendant-Appellee.* | No. 06-35587 D.C. No. CV-02-00430-MWM OPINION |

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted
March 5, 2008—Portland, Oregon

Filed March 3, 2009

Before: Ferdinand F. Fernandez and Marsha S. Berzon,
Circuit Judges, and Otis D. Wright, II*, District Judge.

*The Honorable Otis D. Wright, II, United States District Judge for the
Central District of California, sitting by designation.

Per Curiam Opinion;
Dissent by Judge Berzon;
Concurrence by Judge Fernandez

**COUNSEL**

Jeffrey S. Lena, Law Office of Jeffrey S. Lena, Berkeley, California for the defendant-appellant-cross-appellee.

Marci A. Hamilton, Washington Crossing, Pennsylvania, for the plaintiff-appellee-cross-appellant.

**OPINION**

PER CURIAM:

We consider whether, on the allegations made in the Plaintiff's complaint in this case, the Holy See is entitled to immunity from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602-1611.

John V. Doe brought suit in the United States District Court for the District of Oregon against the Holy See, the Archdiocese of Portland, Oregon ("Archdiocese"), the Catholic Bishop of Chicago ("Chicago Bishop"), and the Order of the Friar Servants ("Order"), alleging that when he was fifteen or sixteen years old he was sexually abused by Father Ronan, a priest in the Archdiocese and a member of the Order. Doe alleged various causes of action against the Holy See: (1) for vicarious liability based on the actions of the Holy See's instrumentalities, the Archdiocese, the Chicago Bishop, and the Order; (2) for respondeat superior liability based on the actions of the Holy See's employee, Ronan; and (3) for direct liability for the Holy See's own negligent retention and supervision of Ronan and its negligent failure to warn Doe of

Ronan's dangerous proclivities. The Holy See contended in the district court that all of Doe's causes of action against it must be dismissed because, as a foreign sovereign, it is immune from suit in U.S. courts. The district court disagreed, holding that it has jurisdiction over all but one of Doe's claims under the FSIA's tortious act exception to sovereign immunity. The Holy See appeals.

For the reasons explained below, we affirm the district court in part and reverse in part as to the Holy See's appeal. As to the Holy See's vicarious liability for the acts of the Archdiocese, the Chicago Bishop, and the Order, we conclude that Doe has not alleged facts sufficient to overcome the presumption of separate juridical status for governmental instrumentalities, so the negligent acts of those entities cannot be attributed to the Holy See for jurisdictional purposes. Doe's vicarious liability claims therefore cannot go forward as pleaded. As to the Holy See's respondeat superior liability for Ronan's acts, we conclude that, because Doe has sufficiently alleged that Ronan was an employee of the Holy See acting within the "scope of his employment" under Oregon law, Ronan's acts can be attributed to the Holy See for jurisdictional purposes. Further, we agree with the district court that Ronan's acts come within the FSIA's tortious act exception, so the Holy See is not immune from suit for the respondeat superior cause of action. Although the district court held that Doe's negligence claims against the Holy See could proceed under the FSIA's tortious act exception, we conclude that they cannot, because the FSIA preserves immunity for discretionary acts. However, we do not have jurisdiction to consider the cross-appeal as to the commercial activity exception at this time. The decision of the district court on the appeal by the Holy See is therefore affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion. We dismiss the cross-appeal.

## I.  PROCEDURAL BACKGROUND

### A.  Complaint

In his amended complaint, filed April 1, 2004, Doe describes as follows Father Andrew Ronan's alleged sexual abuse of young boys: In 1955 or 1956, while employed as a parish priest in the Archdiocese of Armagh, Ireland, Father Ronan molested a minor and admitted to doing so. Ronan was later removed from Our Lady of Benburb and placed in the employ of the Chicago Bishop, at St. Philip's High School. At St. Philip's, Ronan molested at least three male students. Confronted with allegations of abuse, Ronan admitted to molesting the boys. The Chicago Bishop, "acting in accordance with the policies, practices, and procedures" of the Holy See, did not discipline or remove Ronan from his post.[1]

In approximately 1965, when Doe was 15 or 16 years old, the Holy See and the Order of the Friar Servants, of which Ronan was a member, "placed" Ronan in a parish priest position at St. Albert's Church in Portland, Oregon. Doe met Ronan at St. Albert's and came to know Ronan "as his priest, counselor and spiritual adviser." Doe was a devout Roman Catholic, and for him "Ronan was a person of great influence and persuasion as a holy man and authority figure." Using his position of trust and authority, Ronan "engaged in harmful sexual contact upon" Doe on repeated occasions. The sexual contact occurred "in several places including the monastery and surrounding areas."

Based on these facts, Doe alleged causes of action against the Holy See, its "instrumentalities or agents" ("Does 1-10"), the Archdiocese, the Chicago Bishop, and the Order, all of whom it alleged were employers of Ronan. According to the amended complaint:

---

[1]These are, of course, only allegations, but we are required to take them as true for the purposes of this appeal. *See infra*, Part III.A.

Defendant Holy See is the ecclesiastical, governmental, and administrative capital of the Roman Catholic Church. Defendant Holy See is the composite of the authority, jurisdiction, and sovereignty vested in the Pope and his delegated advisors to direct the world-wide Roman Catholic Church. Defendant Holy See has unqualified power over the Catholic Church including each and every individual and section of the [C]hurch. Defendant Holy See directs, supervises, supports, promotes[,] and engages in providing religious and pastoral guidance, education[,] and counseling services to Roman Catholics world-wide in exchange for all or a portion of the revenues derived from its members for these services. The Holy See engages in these activities through its agents, cardinals, bishops[,] and clergy, including religious order priests, brothers[,] and sisters, who engage in pastoral work under the authority of its bishop[s]. The Holy See is supported through the contributions of the faithful[,] which are received through donations from the dioceses around the world, including those in the United States. Defendant Holy See promotes and safeguards the morals and standards of conduct of the clergy of the [C]atholic [C]hurch. Defendant Holy See does this by and through its agents and instrumentalities, including the Congregation for the Clergy and the Congregation for Religious both delegated by the Pope and acting on his behalf. It creates, divides[,] and re-aligns dioceses, archdioceses[,] and ecclesiastical provinces. It also gives final approval to the creation, division[,] or suppression of provinces of religious orders. . . . It creates, appoints, assigns and re-assigns bishops [and] superiors of religious orders, and through the bishops and superiors of religious orders [it] has the power to directly assign and remove individual clergy. All bishops, clergy, and priests, including religious order priests, vow to

show respect and obedience to the Pope and their bishop. Defendant Holy See also examines and is responsible for the work and discipline and all those things which concern bishops, superiors of religious orders, priests[,] and deacons of the religious clergy. In furtherance of this duty, Defendant Holy See requires bishops to file a report, on a regular basis, outlining the status of, and any problems with, clergy. Defendant Holy See promulgates and enforces the laws and regulations regarding the education, training[,] and standards of conduct and discipline for its members and those who serve in the governmental, administrative, judicial, educational[,] and pastoral workings of the Catholic [C]hurch world-wide. Defendant Holy See is also directly responsible for removing superiors of religious orders, bishops, archbishops[,] and cardinals from service and/or making them ineligible for positions of leadership in the various divisions and offices of the Catholic [C]hurch.

The Archdiocese, according to the amendment complaint, is a corporation incorporated under the laws of the state of Oregon and is therefore a citizen of that state. It "provided pastoral services to [Doe] and his immediate family through its parishes." The Chicago Bishop is incorporated under the laws of the state of Illinois and is a citizen of that state. Finally, the Order is "a citizen of the state of Illinois," but it operates worldwide. It is under the "ultimate authority of" the Holy See.

Doe alleged that the Archdiocese and the Order were vicariously liable for Ronan's abuse of Doe, and that the Chicago Bishop and the Order were negligent in failing to warn the Archdiocese and Doe of Ronan's propensities. Doe also alleged that the Holy See was vicariously liable for Ronan's abuse of Doe and for the negligent actions of the Archdiocese, the Order, and the Chicago Bishop, and that the Holy See was

itself negligent in its retention and supervision of Ronan and in failing to warn of his propensities.

## B.  District Court Decision

The Holy See moved to dismiss the complaint in its entirety for lack of subject-matter jurisdiction, arguing that as a foreign sovereign, it is presumptively immune from suit under the FSIA, and that neither the "tortious act" exception to sovereign immunity, 28 U.S.C. § 1605(a)(5), nor the "commercial activity" exception to sovereign immunity, 28 U.S.C. § 1605(a)(2), applies. The district court held that the commercial activity exception does not apply to permit the exercise of jurisdiction over Doe's claims; the court did not view the Holy See's activities as commercial because "the true essence of the complaint . . . clearly sound[s] in tort." *Doe v. Holy See*, 434 F. Supp. 2d 925, 942 (D. Or. 2006). In contrast, the district court held that the tortious act exception does apply, permitting it to exercise jurisdiction over all Doe's claims except for the fraud claim. *Id.* at 957. The district court therefore granted the Holy See's motion to dismiss as to the fraud claim, but it denied the motion as to all of Doe's other claims.

The Holy See appeals the district court's decision that the tortious act exception applies. Doe cross-appeals the district court's dismissal of his fraud claim, contending that the commercial activity exception permits federal court jurisdiction over that cause of action.

## II.  STATUTORY FRAMEWORK

For much of our nation's history, from at least 1812 until 1952, "the United States generally granted foreign sovereigns complete immunity from suit in the courts of this country." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983) (citing *The Schooner Exchange v. M'Faddon*, 7 Cranch 116, 3 L. Ed. 287 (1812)). In 1952, however, the State Department adopted a more "restrictive" theory of foreign

sovereign immunity, under which sovereign "immunity is confined to suits involving the foreign sovereign's public acts." *Id*. at 487. Applying this restrictive approach, questions of foreign sovereign immunity arising in U.S. courts were decided on a case-by-case basis, often with the assistance of letters from the State Department containing "suggestions of immunity." *Id.*

In 1976, to "clarify the governing standards" and to insulate the issue of sovereign immunity from the impact of "case-by-case diplomatic pressures," Congress enacted the FSIA, 28 U.S.C. §§ 1330, 1602-1611. *Verlinden*, 461 U.S. at 488. The FSIA contains "a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities." *Id.* at 488. It is this set of legal standards with which we deal today.

**[1]** Under the FSIA, a foreign state is "immune from the jurisdiction of the courts of the United States and of the States" unless one of the statute's enumerated exceptions applies. 28 U.S.C. § 1604. A foreign state "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state." *Id.* § 1603(a). An "agency or instrumentality of a foreign state" is defined in turn as any entity:

> (1) which is a separate legal person, corporate or otherwise, and
>
> (2)   which is an organ of a foreign state or political subdivision thereof, . . . and
>
> (3) which is neither a citizen of a State of the United States . . . nor created under the laws of any third country.

*Id.* § 1603(b).

**[2]** Section 1605[2] contains "[g]eneral exceptions to the jurisdictional immunity of a foreign state," providing in relevant part that:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case —

. . .

(2)   in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

. . .

(5)   not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to —

(A)   any claim based upon the exercise or performance or the failure to exercise or

---

[2]All statutory citations are to Title 28 of the United States Code unless otherwise indicated.

perform a discretionary function regardless of whether the discretion be abused, or

(B)   any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights . . .

The statute further defines the elements of the commercial activity exception: A " 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* § 1603(d). A " 'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such state and having substantial contact with the United States." *Id.* § 1603(e).

The statute does not set out any substantive rules of liability, but instead provides that, "[a]s to any claim for relief with respect to which a foreign state is not entitled to immunity under" the statute, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." *Id.* § 1606.

## III.   ANALYSIS

### A.   Standard for Motions to Dismiss Based on Foreign Sovereign Immunity

The Holy See has brought a facial attack on the subject matter jurisdiction of the district court under Rule 12(b)(1). We therefore "assume [plaintiff's] [factual] allegations to be true and draw all reasonable inferences in his favor." *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004); *see also McNatt v. Apfel*, 201 F.3d 1084, 1087 (9th Cir. 2000) (holding that we "favorably view[ ] the facts alleged to support juris-

diction"). We do not, however, accept the "truth of *legal* conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (emphasis added; internal quotations omitted) (quoting *W. Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir. 1981)).

The Holy See suggests that when evaluating facial motions to dismiss based on foreign sovereign immunity, we must require a greater-than-usual level of detail in the pleadings, and may not construe factual allegations in favor of the plaintiff. Neither contention is correct. The cases on which the Holy See relies involve *fact-based* challenges to subject-matter jurisdiction. *See, e.g.*, *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 137-38, 146 (2d Cir. 2001) (relying on testimony and affidavits from the parties in concluding that the "generic allegations" in the complaint were insufficient to establish subject matter jurisdiction under the FSIA). In such cases, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).

Here, in contrast, the Holy See is contending that on the face of the complaint, we lack subject matter jurisdiction; it has introduced no evidence contesting any of the allegations. With regard to such a challenge, a motion to dismiss for lack of jurisdiction under the FSIA is no different from any other motion to dismiss on the pleadings for lack of jurisdiction, and we apply the same standards in evaluating its merit. *See, e.g., Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). As the D.C. Circuit explained in *Rong v. Liaoning Province Gov't*, 452 F.3d 883, 888 (D.C. Cir. 2006), in the foreign sovereign immunity context, "[i]f the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they

bring the case within any of the exceptions to immunity invoked by the plaintiff."

Moreover, we have never held that anything other than our usual notice pleading standard applies to complaints that allege an exception to foreign sovereign immunity. Under notice pleading rules, we require only "a short and plain statement" of the grounds for jurisdiction and the claim for relief. Fed. R. Civ. P. 8(a)(1), (2); *see also Bell Atlantic Corp. v. Twombley*, ___ U.S. ___, 127 S.Ct. 1955, 1964-65 (2007). We do not impose a heightened pleading standard in the absence of "an explicit requirement in a statute or federal rule," *Skaff v. Meridien North America Beverly Hills, LLC*, 506 F.3d 832, 841 (9th Cir. 2007); there is no such explicit requirement here applicable. In evaluating assertions of subject-matter jurisdiction based on an exception to foreign sovereign immunity, then, we apply the same notice pleading requirements we would apply to any other assertion of subject-matter jurisdiction and look only for a "short and plain statement" of the basis for jurisdiction.

## B. Appellate Jurisdiction

### 1. Jurisdiction Over Appeal

A district court's denial of immunity to a foreign sovereign is an appealable order under the collateral order doctrine. *See Schoenberg v. Exportadora de Sal, S.A.*, 930 F.2d 777, 779 (9th Cir. 1991); *see also In re Republic of the Phil.*, 309 F.3d 1143, 1148 (9th Cir. 2002) (explaining that refusal to dismiss on grounds of sovereign immunity is within the collateral order doctrine because it "may result in the parties having to litigate claims over which the court lacks jurisdiction").

### 2. Jurisdiction over Cross-Appeal

Doe cross-appeals and argues that his claims come within the FSIA's commercial activity exception to sovereign immu-

nity, § 1605(a)(2). The Holy See contends that we do not have jurisdiction over Doe's cross-appeal because it is not "inextricably intertwined" with the collaterally appealable issue of whether the Holy See is immune from suit. *See Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1093-94 (9th Cir. 2007) (in a case involving a collaterally appealable order, denying a tribe sovereign immunity, but holding that the court could not reach other issues raised on appeal because they were not "inextricably intertwined" with the collaterally appealable issue). According to the Holy See, we do not have jurisdiction to consider Doe's argument that his claims come within the commercial activity exception. We agree.

[3] As a general rule, the collateral order doctrine permits appellate jurisdiction only over those decisions of a district court that "conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and [are] effectively unreviewable on appeal from a final judgment." *See In re Copley Press, Inc.*, 518 F.3d 1022, 1025 (9th Cir. 2008) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)). A decision denying immunity to a foreign sovereign meets those requirements. *See Gupta v. Thai Airways Int'l, Ltd.*, 487 F.3d 759, 763-64 & n.6 (9th Cir. 2007). Additionally, permitting a trial to go forward against a foreign sovereign when there is a claim of sovereign immunity "imperil[s] a substantial public interest." *See Will v. Hallock*, 546 U.S. 345, 353 (2006) (explaining why decisions denying absolute, qualified, and Eleventh Amendment immunity come within the collaterally appealable order doctrine).

The collaterally appealable order doctrine does not automatically permit review of district court rulings contained in the same district court opinion as the appealable determination, if they do not themselves meet these requirements. *See Abney v. United States*, 431 U.S. 651, 663 (1977) (after concluding that the collateral order doctrine applies to a decision denying a motion to dismiss on double jeopardy grounds,

holding that "other claims presented to, and rejected by, the district court in passing on the . . . motion to dismiss . . . are appealable if, and only if, they too fall within [the] collateral-order exception to the final-judgment rule"); *Burlington N.*, 509 F.3d at 1089, 1093-94 (refusing to exercise pendent appellate jurisdiction over an exhaustion issue decided in the same district court order as the collaterally appealable question); *United States v. Yellow Freight Sys., Inc.*, 637 F.2d 1248, 1251 (9th Cir. 1980) ("Inquiry into the immediate appealability of a particular pretrial order must focus upon each claim asserted."); *but cf. Joseph v. Office of Consulate Gen. of Nig.*, 830 F.2d 1018, 1021 (9th Cir. 1987) (assuming jurisdiction over cross-appeal in FSIA case, without explanation).

Here, the tort causes of action are not inextricably intertwined with Doe's other claims. Thus, that concept is not sufficient to allow Doe to appeal the district court's grant of immunity as far as that exception is concerned.[3]

Nor do we agree that we ought to simply take up the com-

---

[3]We are aware of the fact that § 1605(a)(5), identifying the tortious act exception, is applicable to cases "not otherwise encompassed in paragraph (2) [the commercial activity exception] above." This language does not mean that, in interpreting the tortious act exception in (a)(5), we must always first consider whether the commercial activity exception in (a)(2) applies. Courts have not proceeded in that fashion. *See, e.g., Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439-43 (1989); *Blaxland v. Commonwealth Dir. of Public Prosecutions*, 323 F.3d 1198, 1203-04 (9th Cir. 2003); *Risk v. Halvorsen*, 936 F.2d 393, 395-96 (9th Cir. 1991). Indeed, in *Joseph*, 830 F.2d at 1025, we explicitly stated that because we could decide the question presented under subsection (a)(5), there was no need to consider subsection (a)(2) at all. Other courts have reached the same result. *See, e.g., Robinson v. Gov't of Malay.*, 269 F.3d 133, 145-47 (2d Cir. 2001); *Cabiri v. Gov't of Republic of Ghana*, 165 F.3d 193, 199-201 (2d Cir. 1999); *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 379 (7th Cir. 1985); *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1524-25 (D.C. Cir. 1984); *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 838-39 (D.C. Cir. 1984).

mercial activity issue on the basis that it is no more than an alternate ground to uphold the district court. In fact, the need for review of immunity denials — avoiding the undermining of the purpose of the grant of immunity[4] — has no weight where immunity has been granted. Were there any doubt about that, the sensitive nature of the issues dealing with sovereigns would convince us that it would generally be prudentially unsound to expand review into the area of immunity grants when an appeal is taken from a denial of immunity.

[4] This case points up one of the perils of undertaking unnecessary review of grants of immunity. On this appeal we are presented with comparatively straightforward questions about the relationship between the Holy See and local priests under the tort exception. But the cross-appeal seeks to expand our inquiry into the arcane question of whether church functions are commercial activity because churches receive financial support from their parishioners, or otherwise. That is an issue that actually has nothing to do with the issues on interlocutory appeal.

[5] To say it another way, it is well established that, although an interlocutory appeal can be taken whenever immunity (absolute or qualified) is denied to a person or entity claiming entitlement thereto, an expansion to other issues is not usually allowed. *See Swint v. Chambers County Comm'n.*, 514 U.S. 35, 43-51 (1995); *Cunningham v. Gates*, 229 F.3d 1271, 1284-86 (9th Cir. 2000). We are asked to, in effect, change that rule so that whenever immunity is denied on one set of issues but granted on another set, a cross-appeal can be taken regarding the granted set. Surely that would be the ineluctable effect of Doe's request. One would not even need to show, by the way, a true interlocking of issues beyond the fact that both deal with immunity. One would only need to argue that the alternative set will support the denial of immunity on a wholly different basis. That approach would be

---

[4]*See Gupta*, 487 F.3d at 763-64.

followed even if the district court had expressly ruled to the contrary on the alternative set of issues.[5] In other words, here we would be asked to take up the appeal from that grant and reverse the district court's determination; we would have to reach out and engage in a lengthy disquisition on the commercial activity exception to FSIA, which we neither must nor should do.

[6] Thus, we will not consider issues regarding the district court's grant of immunity under the commercial exception to the FSIA.

## C.  Determining Which Acts May Be Attributed to the Holy See for Jurisdictional Purposes

Before turning to the question of which, if any, of the FSIA's exceptions to immunity apply, we must determine which of the acts alleged in the complaint may legitimately be attributed to the Holy See for purposes of establishing jurisdiction. Doe's complaint alleges tortious acts by the Archdiocese, the Order, and the Bishop, all alleged to be corporations created by the Holy See. The Holy See argues that we may not consider these alleged acts by the Archdiocese, the Order, and the Bishop when determining whether jurisdiction exists over the Holy See, because Doe has not alleged facts that

---

[5]We are aware of the theory that allows alternate grounds to be used to support a district court decision, even where no cross-appeal has been filed. S*ee El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 479-80 (1999); *Rivero v. City & County of San Francisco*, 316 F.3d 857, 861-62 (9th Cir. 2002). We have said that taking jurisdiction in that instance is prudential and discretionary. *See Lee v. Burlington N. Santa Fe Ry. Co.*, 245 F.3d 1102, 1107 (9th Cir. 2001); *Bryant v. Tech. Research Co.*, 654 F.2d 1337, 1341-42 (9th Cir. 1981). For reasons explained in the text, we would decline to exercise that jurisdiction. The theory makes a good deal of jurisprudential sense when both the grant and the denial of relief were actually appealable issues; it makes much less sense where, as here, a grant of immunity is not interlocutorily appealable at all and would involve, as we have said, a vast expansion of the issues in and complexity of the appeal.

would overcome the presumption of separate juridical status such that the acts of the latter could be attributed to the former.[6] For the reasons explained below, given the allegations that Doe has pleaded, we agree with the Holy See. In addition, however, the complaint alleges a number of actions performed by the Holy See itself, such as "creat[ing]" dioceses and archdioceses, "giv[ing] final approval to the creation, division or suppression of provinces of religious orders," "employ[ing]" Ronan, and "plac[ing]" Ronan in the Archdiocese in Portland, Oregon. We conclude below that these acts do establish jurisdiction over the Holy See for the claims to which the acts are relevant.

### 1. Determining Whether an Agency Relationship Exists Between the Holy See and Its Domestic Corporations for Purposes of Establishing Jurisdiction over the Holy See

#### a.   The Bancec standard

In arguing that the actions of the corporations are not attributable to Holy See for purposes of determining jurisdiction, the Holy See relies on *First Nat. City Bank v. Banco Para el Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611 (1983). In *Bancec*, the Supreme Court considered whether an instrumentality created by a foreign state could be held liable for

---

[6]We note that the question we address here is distinct from the question whether the Archdiocese, the Chicago Bishop, and the Order are themselves immune from suit under the FSIA. An "agency or instrumentality" of a foreign state, as defined by the FSIA, is immune from suit because it is itself a "foreign state" within the meaning of the Act. § 1603(a), (b). On the allegation of the complaint, however, the Archdiocese, the Chicago Bishop, and the Order are not "agencies or instrumentalities" of a foreign state within the meaning of the FSIA, because they are all citizens of the United States. *See* § 1603(b) (an agency or instrumentality of a foreign state means, among other things, an entity "which is neither a citizen of a State of the United States . . . nor created under the laws of any third country"). They are therefore not immune from suit.

the actions of the foreign state itself, a question the reverse of ours. Bancec was "the Cuban Government's exclusive agent in foreign trade," and the "government supplied all of [Bancec]'s capital and owned all of its stock." *Id.* at 614. Soon after Bancec sought to collect on a letter of credit that had been issued in its favor by Citibank, the Cuban government seized and nationalized all of Citibank's assets in Cuba. *Id.* So, when Bancec filed an action in U.S. federal court to recover on the letter of credit, Citibank counterclaimed, seeking a setoff for the value of its expropriated Cuban branches. *Id.* at 614-15. In the meantime, Bancec was dissolved, and Bancec filed a stipulation "stating that . . . its claim had been transferred to the Ministry of Foreign Trade" of Cuba. *Id.* at 615-16.

Jurisdiction in *Bancec* existed under FSIA's counterclaim provision, 28 U.S.C. § 1607(c).**[7]** *Id.* at 620-21. Because jurisdiction was not at issue, the question for the Supreme Court was one of liability: whether Bancec could be held liable for the act of expropriation committed by the Cuban government. *Id.* at 617.

**[7]** The Supreme Court began by noting that, although Bancec was an "agency or instrumentality" of Cuba within the meaning of FSIA § 1603(b), this status was relevant only to jurisdiction; it did not control the question of Bancec's liability for Cuba's actions. The FSIA "was not intended to affect the substantive law determining the liability of a foreign state or instrumentality." *Id.* at 620. Instead, liability was to be assessed according to corporate law principles "common to both international law and federal common law." *Id.* at 623.

---

**[7]**"In any action brought by a foreign state [or its agency or instrumentality] . . . in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim . . . to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state." 28 U.S.C. § 1607(c).

Surveying international and federal law on the status of corporations, the Supreme Court recognized a presumption of "separate juridical [status]" for the instrumentalities of foreign states. *Id*. at 624, 624-28.

**[8]** That presumption can be overcome, the Court explained, in two instances: when "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," or when recognizing the separate status of a corporation "would work fraud or injustice." *Id*. at 629. The Court then held the latter standard dispositive of Bancec's case: The Cuban government could not have sued in its own name in a U.S. court "without waiving its sovereign immunity and answering for [its] seizure of Citibank's assets." *Id.* at 633. Instead, Cuba had transferred its assets to separate entities, and Bancec then sought to avoid liability for the seizure. "[T]he Cuban government . . . [and] not any third parties that may have relied on Bancec's separate juridical identity" would be the real beneficiary if Bancec was not held liable for the Cuban government's actions. *Id.* at 631-32. Given this circumstance, the Court concluded that to "adhere blindly to the corporate form" would work such an "injustice" that the presumption of separate juridical status had been overcome. *Id*. at 632. Holding Bancec liable for the Cuban government's actions, the Court held that Citibank was entitled to offset the value of its seized assets from the amount it owed to Bancec. *Id*. at 634.

**[9]** The Supreme Court in *Bancec* did not have the opportunity to consider whether the actions of a *corporation* may be attributed to the *sovereign* — the reverse of the *Bancec* scenario — for purposes of determining whether jurisdiction over that sovereign exists. This Circuit has not previously addressed that question either.[8] At least two other circuits,

---

[8]We have, however, applied the *Bancec* presumption of separate juridical status at the merits phase of FSIA litigation. *See Flatow v. Islamic Republic of Iran*, 308 F.3d 1065 (9th Cir. 2002) (applying *Bancec* in a case in which an individual who had obtained a judgment against Iran attempted to enforce it against the Bank Saderat Iran).

however, faced with such a scenario, have applied *Bancec*'s substantive corporate law principles in determining whether jurisdiction exists under the FSIA.

In *Transamerica Leasing v. La Republica de Venezuela*, 200 F.3d 843 (D.C. Cir. 2000), a plaintiff sued Venezuela, alleging that Venezuela was liable for the commercial acts of a government instrumentality, CAVN. *Id.* at 846. To determine whether Venezuela was amenable to suit under the commercial activity exception, the court turned to the *Bancec* test and asked whether (1) Venezuela and CAVN had a principal-agent relationship, or (2) recognizing CAVN as a separate entity would work an injustice. *Id.* at 848. Although it acknowledged that "*Bancec* recognized these as exceptions to the rule that a foreign sovereign is not *liable* for the acts of an instrumentality of the state," the D.C. Circuit held that "they serve also as exceptions to the rule that a foreign sovereign is not *amenable to suit* based on the acts of such an instrumentality." *Id.* (emphasis added). *See also Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 446 (D.C. Cir. 1990) ("The presumption of juridical separateness of entities also applies to jurisdictional issues."). The Fifth Circuit adopted the same principle in *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 533-36 (5th Cir. 1992), refusing to attribute the actions of a private labor union to the Mexican state-owned oil company for purposes of determining FSIA jurisdiction.

**[10]** We join the D.C. Circuit and the Fifth Circuit in extending *Bancec*'s analysis to the question whether the actions of a corporation may render a foreign sovereign amenable to suit. A foreign state can only "act[ ] through its agents," be they corporations or individual people. *Phaneuf v. Republic of Indonesia*, 106 F.3d 302, 307-08 (9th Cir. 1997) ("Because a foreign state acts through its agents, an agent's deed . . . constitutes activity 'of the foreign state.' "); *see also Gilson v. Republic of Ireland*, 682 F.2d 1022, 1026 n.16 (D.C. Cir. 1982) (noting that "the activities of an agent may be attri-

buted to the principal for jurisdictional purposes"). Therefore, in applying the jurisdictional provisions of the FSIA, courts will routinely have to decide whether a particular individual or corporation is an agent of a foreign state.

[11] *Bancec* provides a workable standard for deciding this question. Applying *Bancec*'s presumption in favor of separate juridical status for foreign state instrumentalities at the jurisdiction phase, not just at the liability phase, is consistent with the FSIA's broad policy goals. In *Bancec*, the Court discussed at length the comity considerations at play when entertaining suits against foreign government instrumentalities in U.S. courts. 462 U.S. at 626; *see also Republic of Austria v. Altmann*, 541 U.S. 677, 688 (2004). As at the merits phase, failing to recognize the presumption of separate juridical status at the jurisdictional phase could "result in substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign," and might frustrate "the efforts of sovereign nations to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration." *Bancec*, 462 U.S. at 626. Applying *Bancec*'s presumption — as well as the standard for overcoming that presumption — at the outset of a suit as well as at the merits phase makes good sense.

With these considerations in mind, we conclude that it is appropriate to use the *Bancec* standard to determine whether Doe's allegations are sufficient to permit jurisdiction over the Holy See based on acts committed by its affiliated domestic corporations.

### b.   *Applying the* Bancec *standard to Doe's complaint*

[12] Applying the rule of *Bancec* to the allegations in Doe's complaint, we conclude that Doe has not alleged sufficient facts to overcome the "presumption of separate juridical status," for reasons similar to those dispositive in the converse

situation in *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065 (9th Cir. 2002). In *Flatow*, we applied *Bancec* to the relationship between the Iranian government and the Bank Saderat Iran ("BSI"). BSI was created by the Iranian government and fully owned by it. *Id.* at 1072-73. Its actions were regulated by Iran's General Assembly of Banks and High Council of Banks, which reviewed BSI's annual statements and "perform[ed] broad policymaking functions." *Id.* at 1073. *Flatow* held these facts insufficient to overcome the presumption of separate juridical status, because the government's "involvement [did not] rise to a [sufficiently] high[ ] level," and in particular, did not involve "day-to-day" control. *Id.* (citing *McKesson Corp v. Islamic Republic of Iran*, 52 F.3d 346, 351-52 (D.C. Cir. 1995) (holding the presumption of separateness overcome where Iran controlled routine business decisions, such as declaring and paying dividends and honoring contracts).

Doe's complaint does not allege day-to-day, routine involvement of the Holy See in the affairs of the Archdiocese, the Order, and the Bishop. Instead, it alleges that the Holy See "creates, divides[,] and re-aligns dioceses, archdioceses and ecclesiastical provinces" and "gives final approval to the creation, division or suppression of provinces of religious orders." Doe also alleges that the Holy See "promulgates and enforces the laws and regulations regarding the education, training[,] and standards of conduct and discipline for its members and those who serve in the governmental, administrative, judicial, educational[,] and pastoral workings of the Catholic [C]hurch world-wide." These factual allegations — that the Holy See participated in creating the corporations and continues to promulgate laws and regulations that apply to them — are quite similar to the facts in *Flatow*, and are, as in *Flatow*, insufficient to overcome the presumption of separate juridical status.

Doe does directly allege in his complaint that the corporations are "agents" of the Holy See. In this context, however,

the term "agent" is not self-explanatory. "Agent" can have more than one legal meaning: the standard for determining that a natural person is the agent of another differs from the standard for attribution of the actions of a corporation to another entity. *See, e.g.*, *Rough & Ready Lumber Co. v. Blue Sky Forest Products*, 105 Or. App. 227, 231 (1991) (an agency relationship between two natural persons "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.") (quoting Restatement (Second) of Agency § 1 (1958)). The *Bancec* standard is in fact most similar to the "alter ego" or "piercing the corporate veil" standards applied in many state courts to determine whether the actions of a corporation are attributable to its owners. *See, e.g.*, *Amfac Foods, Inc. v. Int'l Sys. & Controls Corp.*, 294 Or. 94, 107-08 (1982) (holding that to demonstrate alter ego status, plaintiff must show control of the subsidiary and that "the plaintiff's inability to collect from the corporation resulted from some form of improper conduct" on part of parent corporation). Even reading the complaint generously to Doe, as we must, we cannot infer from the use of the word "agent" that Doe is alleging the type of day-to-day control that *Bancec* and *Flatow* require to overcome the presumption of separate juridical status.

The district court apparently found jurisdiction proper by relying on the second, equitable prong of *Bancec*, noting that "foreign states cannot avoid their obligations to third parties by engaging in abuses of the corporate form." *Doe*, 434 F. Supp. 2d at 936. But Doe has not alleged that the Holy See has inappropriately used the separate status of the corporations to its own benefit, as in *Bancec*, or that the Holy See created the corporations for the purpose of evading liability for its own wrongs. Rather, in ruling for Doe on this point, the district court seemed to be influenced by the complaint's allegations of wrongful acts perpetrated directly by the Holy See. *See Doe*, 434 F. Supp. 2d at 937. The existence of such *direct* wrongful acts cannot determine whether the distinct wrongful

acts of the affiliated *corporations* should also be attributed to the Holy See.

**[13]** Doe's vicarious liability claim for the actions of the Archdiocese, Chicago Bishop, and Order is based entirely on an allegation that the actions of the domestic corporations are attributable to the Holy See. Doe has therefore not alleged sufficient facts to demonstrate that any exception to sovereign immunity applies to that cause of action. We therefore conclude that the district court lacked jurisdiction over the Holy See for the tortious acts allegedly committed by the Archdiocese, the Chicago Bishop, and the Order.

### 2. Actions Performed by the Holy See Itself

As to Doe's other causes of action, the Holy See contends that Doe has failed to allege any facts in support of his claims based on the actions of the Holy See itself, rather than of its domestic corporations. We do not agree. Doe has made several allegations regarding actions taken by the Holy See itself — namely, its negligent retention and supervision of Ronan and its failure to warn Doe of Ronan's dangerousness. Doe has also alleged respondeat superior liability against the Holy See for Ronan's actions as an alleged employee of the Holy See. We turn now to those allegations, considering whether they are sufficient to support jurisdiction over the Holy See.

We will now examine whether the district court could exercise jurisdiction over the Holy See for these causes of action under the FSIA's tortious act exception.

### D. Tortious Act Exception

The district court held that all of Doe's claims, except the one for fraud, come within the exception to immunity for a "tortious act or omission of [a] foreign state or of any official or employee of that foreign state while acting within the scope

of his or her employment." § 1605(a)(2); *Doe*, 434 F. Supp. 2d at 950. We agree in part.

Doe's respondeat superior claim based on Ronan's actions comes within the tortious act exception. Doe has clearly alleged that Ronan was an employee of the Holy See, acting within the scope of his employment, when he molested Doe. We conclude, however, that Doe's claims against the Holy See for negligent retention and supervision and failure to warn cannot be brought under the tort exception because they are barred by the FSIA's exclusion for discretionary functions, § 1605(a)(5)(A).

### 1.   *Respondeat superior for Father Ronan's tortious acts*

#### a.   *The meaning of "employee"*

In his complaint, Doe alleges that the Holy See "employed priests, including one Father Andrew Ronan" and that Ronan was under the "direct supervision and control" of the Holy See. The Holy See was further "responsible for the work and discipline [of] . . . priests." According to the complaint, the Holy See on at least one occasion was responsible for controlling where Ronan performed his functions: the Holy See "placed Ronan in [the] Archdiocese at St. Albert's Church in Portland, Oregon."

The Holy See maintains that Doe has not alleged sufficient facts to demonstrate that Ronan was an "employee" of the Holy See for purposes of the tortious act exception, because the word "employee" is a legal conclusion we are not required to accept as true. We are highly skeptical of the notion that, under notice pleading, use of the word "employee" in a complaint is insufficient to establish an allegation of an employment relationship. True, in addition to being a word used in everyday speech, "employee" does have a common law legal definition. *See, e.g.*, *Schaff v. Ray's Land & Sea Food Co.*, 45 P.3d 936, 939 (Or. 2002) (defining "employee" for purposes

of Oregon law). But then, of course, so do the words "person," "corporation," "citizen," and "molest," also used in this complaint — and, undoubtedly, in many other complaints filed each year in federal courts — without further definition. Were we to require that every such word used in a complaint be broken down into its constituent factual predicates, we would undermine the purpose of notice pleading — that is, "to focus litigation on the merits of a claim" rather than on procedural requirements. *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125 (9th Cir. 2002). Thus, while we do not accept Doe's legal conclusions as true, we also do not engage in "a hypertechnical reading of the complaint inconsistent with the generous notice pleading standard." *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 (9th Cir. 2002). Although there is undoubtedly a line beyond which the legal definition of a commonly used term is so complex or contentious that failure to allege each element of the definition would prevent a defendant from understanding the factual basis for the claim, use of the word "employee" falls well short of that line.

### b. The meaning of "within the scope of employment"

More complicated under Oregon law is the question of whether Ronan's actions were "within the scope of employment" as the FSIA requires. In *Joseph*, we indicated that the " 'scope of employment' provision of the tortious activity exception essentially requires a finding that the doctrine of respondeat superior applies to the tortious acts of individuals." 830 F.2d at 1025. "This determination is governed by state law." *Id.; see also Randolph*, 97 F.3d at 327.

As it happens, the Oregon Supreme Court has directly addressed whether a church can be liable under respondeat superior for the actions of a priest who sexually assaults a parishioner. In *Fearing v. Bucher*, 977 P.2d 1163 (Or. 1999), the plaintiff alleged that he had been sexually molested by a Catholic priest who "used his position as youth pastor, spiri-

tual guide, confessor, and priest to plaintiff and his family to gain their trust and confidence" and "[b]y virtue of that relationship . . . gained the opportunity to be alone with plaintiff" and sexually assault him. *Id.* at 1166. *Fearing* began its analysis from the proposition that, in a respondeat superior action, an employer can be liable for intentional as well as unintentional torts of an employee if committed "within the scope of employment." *Id.* Generally, under Oregon law, "three requirements must be met to demonstrate that an employee was acting within the course and scope of employment":

> (1) the act must have occurred substantially within the time and space limits authorized by the employment;

> (2) the employee must have been motivated, at least partially, by a purpose to serve the employer; and

> (3) the act must have been of a kind which the employee was hired to perform.

*Id.* at 1166.

Applying these three factors, *Fearing* stated that the priest's "alleged sexual assaults on plaintiff clearly were outside the scope of his employment" under the traditional test, but held that the "inquiry does not end there." *Id.* at 1166. Instead, the court went on to ask whether "acts that *were* within [the priest's] scope of employment resulted in the acts which led to injury to [the] plaintiff." *Id.* (emphasis added; internal quotation marks and citation omitted). The court concluded that because a jury could infer from the facts alleged that "performance of . . . pastoral duties with respect to plaintiff and his family were a necessary precursor to the sexual abuse and that the assaults thus were a direct outgrowth of and were engendered by conduct that was within the scope of . . . employment," *id.* at 1168, the complaint satisfied "all

three . . . requirements for establishing that employee conduct was within the scope of employment." *Id.* at 1167.

**[14]** The Oregon Supreme Court has since clarified that *Fearing* created a "scope of employment" test specifically applicable to intentional torts. *Minnis v. Oregon Mut. Ins. Co.*, 48 P.3d 137 (Or. 2002), observed that, in *Fearing*, there was no question that the first requirement of "the within the scope of employment" test was met, because the abuse occurred "within the time and space limits" of the priest's employment. 48 P.3d at 144-45. But because *Fearing* involved an intentional tort, it was inappropriate to focus on whether the tort itself was committed in furtherance of the employer's objectives or was an act of the kind the employee was hired to perform:

> Rather, for the purpose of determining whether a complaint meets the second and third . . . requirements . . . , the focus properly is directed at whether the complaint contains sufficient allegations of employee's conduct that was within the scope of his employment, that is, conduct that the employee was hired to perform, that arguably resulted in the acts that caused plaintiff's injury.

*Id.* at 144-45 (internal quotation marks, alterations, and citations omitted). *Minnis* thus makes clear that, rather than holding that sexual abuse is not within the scope of employment, *Fearing* created an alternative test with respect to the second and third factors of the "within the scope of employment" standard, applicable when a plaintiff has alleged an intentional tort: An intentional tort is within the scope of employment, and can support respondeat superior liability for the employer, if conduct that was within the scope of employment was "a necessary precursor to the" intentional tort and the intentional tort was "a direct outgrowth of . . . conduct that was within the scope of . . . employment." *Fearing*, 977 P.2d at 1163.

**[15]** Doe's allegations meet this standard. Doe has asserted that he "came to know Ronan as his priest, counselor and spiritual adviser," and that Ronan used his "position of authority" to "engage in harmful sexual contact upon" Doe in "several places including the monastery and surrounding areas in Portland, Oregon." His allegations are thus very similar to those in *Fearing*. 977 P.2d at 1166.

**[16]** Under Oregon law, then, Doe has clearly alleged sufficient facts to show that his claim is based on an injury caused by an "employee" of the foreign state while acting "within the scope of his . . . employment," as required to come within the FSIA's tortious act exception. § 1605(a)(5). The Holy See is therefore not immune from Doe's respondeat superior claim.⁹

### 2. *Negligent retention, supervision, and failure to warn*

According to Doe's complaint, the Holy See "negligently retained Ronan and failed to warn those coming into contact with him," even though it knew or should have known that Ronan had a history of sexually abusing children. The Holy See also "failed to provide reasonable supervision of Ronan." Whether or not this alleged negligence otherwise comes within the language of the FSIA's tortious act exception — a question we do not decide — these causes of action may not go forward under that section because they are barred by the exclusion for "discretionary functions." The district court thus erred in exercising jurisdiction over these claims.

**[17]** The discretionary function exclusion shields foreign sovereigns from tort claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused."

---

⁹We are aware of the fact that the Sixth Circuit has reached a different result, but the law of Kentucky, which it was construing, differs from the law of Oregon. *See O'Bryan v. Holy See*, Nos. 07-5078, 07-5163, ___ F.3d ___, ___, 2009 WL 305342, at *14 (6th Cir. Feb. 10, 2009).

§ 1605(5)(A). The language of the discretionary function exclusion closely parallels the language of a similar exclusion in the Federal Tort Claims Act ("FTCA"), so we look to case law on the FTCA when interpreting the FSIA's discretionary function exclusion. *See* 28 U.S.C. § 2680(a); *Joseph*, 830 F.2d at 1026. Extrapolating from FTCA case law, the Holy See is protected by the discretionary function exclusion if the challenged action meets two criteria: (1) it is "discretionary in nature" or "involve[s] an element of judgment or choice" and (2) "the judgment is of the kind that the discretionary function exception was designed to shield." *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (internal quotation marks and citation omitted); *see also Soldano v. United States,* 453 F.3d 1140, 1145 (9th Cir. 2006) (clarifying that judgments "of the kind that the discretionary function exception was designed to shield" are "governmental actions and decisions based on considerations of public policy.") (internal quotation marks and citations omitted).

**[18]** As to the first *Gaubert* criterion, Doe refers vaguely in his complaint to the Holy See's "policies, practices, and procedures" of not firing priests for, and not warning others about, their abusive acts. He also refers in his brief to a "policy promulgated by the Holy See to cover up incidents of child abuse," which he argues removed "an[y] element of judgment or choice" from the Holy See's actions "to the extent that Appellants were acting pursuant to" it. Yet nowhere does Doe allege the existence of a policy that is "*specific* and *mandatory*" on the Holy See. *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1026 (9th Cir. 1989) (emphasis in original). He does not state the terms of this alleged policy, or describe any documents, promulgations, or orders embodying it. Nor does the complaint in any other way allege that the Holy See's decisions to retain Doe and not warn about his proclivities involved no element of judgment, choice, or discretion. While the burden of proving the *Gaubert* factors ultimately falls on the sovereign entity asserting the discretionary function exception, "a plaintiff

must advance a claim that is facially outside the discretionary function exception in order to survive a motion to dismiss." *Prescott v. United States*, 973 F.2d 696, 702 & n.4 (9th Cir. 1992) (citing *Carlyle v. U.S. Dep't of the Army*, 674 F.2d 554, 556 (6th Cir. 1982) ("Only after a plaintiff has successfully invoked jurisdiction by a pleading that facially alleges matters not excepted by [the FTCA] does the burden fall on the government to prove the applicability of a specific provision of [the FTCA].")). Doe has not pled any actions that fall facially outside the discretionary function exception.

[19] As to the second *Gaubert* criterion, the decision of whether and how to retain and supervise an employee, as well as whether to warn about his dangerous proclivities, are the type of discretionary judgments that the exclusion was designed to protect. We have held the hiring, supervision, and training of employees to be discretionary acts. *See Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000) (holding that plaintiff's claims of "negligent and reckless employment, supervision and training of" employees "fall squarely within the discretionary function exception"); *see also Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1217 (D.C. Cir. 1997) (holding that "decisions concerning the hiring, training, and super[vision]" of employees are discretionary). Moreover, failure to warn about an individual's dangerousness is discretionary.[10] *See Sigman v. United States*,

---

[10]Even were it not the case that the "failure to warn" claim is barred by the discretionary function exclusion, it would be barred by the "misrepresentation" exclusion. Like the discretionary function exclusion, the misrepresentation exclusion in the FSIA, § 1605(a)(5)(B), has been interpreted in light of the misrepresentation exclusion in the FTCA, § 2680(h). *See de Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1398 (5th Cir. 1985). The misrepresentation exclusion covers both acts of affirmative misrepresentation and failure to warn. *See City and County of San Francisco v. United States*, 615 F.2d 498, 505 (9th Cir. 1980) (holding that "a negligent failure to inform, without more, is misrepresentation within the meaning of" the misrepresentation exclusion). In particular, we have held that government officials' failure to warn about an individual's dangerousness, which ultimately led to sexual abuse of a minor, comes within the misrepresentation exclusion. *See Lawrence v. United States*, 340 F.3d 952, 958 (9th Cir. 2003).

217 F.3d 785, 797 (9th Cir. 2000) (failure to warn individuals on Air Force Base about potentially dangerous serviceman was a discretionary function, because it "brought into play sensitive and competing policy considerations of protecting safety while preserving resources and preventing unwarranted alarm"); *Weissich v. United States*, 4 F.3d 810, 814-15 (9th Cir. 1993) (failure of probation officers to warn a prosecutor that probationer was a threat to him was a discretionary decision).

[20] The Holy See's failure to present any evidence that its actions were actually based on policy considerations is not relevant to whether the discretionary function exception applies. A foreign state's decision "need not *actually* be grounded in policy considerations so long as it is, by its nature[,] *susceptible* to a policy analysis." *See Kelly v. United States*, 241 F.3d 755, 764 n.5 (9th Cir. 2001) (second emphasis added). A policy analysis is one that implements "political, social, and economic judgments." *Berkovitz v. United States*, 486 U.S. 531, 539 (1988) (internal quotation marks and citations omitted). In the case of Father Ronan's alleged abuse, the Holy See might have decided to retain him and not to warn his parishioners because it felt that to do otherwise would have harmed the Church's reputation locally, or because it felt that pastoral stability was sufficiently important for the parishioners' well-being, or because low ordination rates or staffing shortages made it necessary to keep Ronan on. That such social, economic, or political policy considerations could have influenced the decision renders it the kind of judgment that the discretionary function exception was designed to shield.

[21] In sum, the tortious act exception does not provide jurisdiction over Doe's negligent hiring, supervision, and failure to warn claims because they are barred by the discretionary function exclusion.[11] We therefore cannot affirm the district court's judgment on this ground.

---

[11]Because we conclude that the tortious act exception does not apply to the above claims, we have no occasion to consider whether the *entire* tort

## IV. CONCLUSION

In conclusion, we observe once again that the Holy See has brought a facial attack on the allegations of subject-matter jurisdiction in the complaint. It remains to be seen whether Doe can prove his allegations. While the Holy See was certainly entitled to bring a facial attack on the complaint, such an approach is not without risk, for it "call[s] upon [us] to decide far-reaching . . . questions" of some importance "on a nonexistent factual record, even where . . . discovery" might "reveal the plaintiff's claims to be factually baseless." *Kwai Fun Wong v. United States*, 373 F.3d 952, 957 (9th Cir. 2004). After careful consideration, we have reached the conclusion that most of Doe's causes of action are not covered by the tort exception and overturn the district court's denial of immunity as to those. However, because it would be improper to consider the commercial activity exception, we express no opinion regarding that exception.

For the foregoing reasons, in appeal No. 06-35563 the decision of the district court is **AFFIRMED** in part, **REVERSED** in part, and **REMANDED**. The cross-appeal (No. 06-35587) is **DISMISSED**. Each party shall bear their own costs.

---

must occur in the United States, as the Sixth and D.C. Circuits have held. *See O'Bryan v. Holy See*, Nos. 07-5078, 07-5163, ___ F.3d ___, ___, 2009 WL 305342, at *13 (6th Cir. Feb. 10, 2009); *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1524-25 (D.C. Cir. 1984). *But see Olsen v. Gov't of Mexico*, 729 F.2d 641, 646 (9th Cir. 1984).

**Volume 2 of 2**

BERZON, Circuit Judge, dissenting in part:

I agree with the majority that Doe's negligence claims against the Holy See, as currently pleaded, cannot proceed under the tortious act exception to the Foreign Sovereign Immunities Act ("FSIA"). Unlike the majority, however, I would affirm the district court's holding that the FSIA does not give the Holy See immunity from Doe's claims of negligent retention, supervision, and failure to warn. As explained below, we have jurisdiction to affirm the district court on any grounds that were raised below and supported by the record, and our case law compels the conclusion that Doe's negligence claims come within the FSIA's commercial activity exception.

## I.   Jurisdiction

We have before us an appeal (by the Holy See) and a cross-appeal (by Doe), both seeking reversal of different aspects of the district court's decision. The Holy See's appeal, which is authorized under the collateral order doctrine, challenges the district court's ruling that the FSIA does not provide it with immunity from Doe's negligence claims. The district court held that although the commercial activity exception does not apply to defeat the Holy See's assertion of immunity, the tortious act exception does apply, permitting all Doe's claims except for the fraud claim to go forward. *See Doe v. Holy See*, 434 F. Supp. 2d 925, 957 (D. Or. 2006). The Holy See asks us to reverse the district court's immunity ruling, arguing that the tortious act exception is not applicable to Doe's negligence claims.

Doe argues, in response, that we should affirm the district court's ruling that the FSIA does not give the Holy See immunity from his negligence claims — either because the district court correctly held that the tortious act exception applies, or, in the alternative, because the commercial activity exception applies. In addition, Doe filed a cross-appeal, urging us to reverse the district court's dismissal of his fraud claim, because the commercial activity exception preserves federal subject matter jurisdiction over that claim. His argument concerning his cross-appeal and his response to the Holy See's appeal of the district court's ruling as to his negligence claims are presented to us in a single brief, but they are clearly separable.

I agree with the majority and the Holy See that we lack jurisdiction over Doe's *actual* cross-appeal — that is, over the question whether the Holy See is immune from Doe's fraud cause of action. We do, however, have jurisdiction over Doe's arguments in favor of *upholding* the district court's order, including his argument that the non-fraud causes of action, which the district court allowed to go forward, are within the commercial activity exception.

Specifically, I agree that the district court's grant of immunity with regard to the fraud cause of action is not independently appealable under the collateral order doctrine at this stage in the proceedings. As the majority notes, where a district court has *granted* sovereign immunity on a particular claim, as opposed to where it has *denied* immunity and let the claim go forward, the concerns for foreign sovereigns that animate the collateral order doctrine do not apply. *See* Maj. Op. at 2559 (quoting *Will v. Hallock*, 546 U.S. 345, 353 (2006)). Further, the district court's grant of immunity and denial of jurisdiction over Doe's fraud cause of action will be reviewable at the end of the entire action, so there is no need to allow review of that decision at this time, before there has been a final judgment on the case as a whole. *See In re Copley Press, Inc.*, 518 F.3d 1022, 1025-26 (9th Cir. 2008).

Nor may we exercise pendent jurisdiction over Doe's fraud cause of action in the course of deciding the Holy See's appeal. To establish jurisdiction over an entity covered by the FSIA, each *individual* claim contained in the complaint must come within an exception to foreign sovereign immunity. *See Joseph v. Office of the Consulate Gen. of Nigeria*, 830 F.2d 1018, 1023-25 (9th Cir. 1987) (analyzing separately whether each of plaintiff's claims came within an exception to foreign sovereign immunity). Therefore, a holding that Doe's respondeat superior or negligence claims come within one of the FSIA's exceptions does not necessarily decide the question whether the fraud claim does so as well. So the fraud cause of action cannot be viewed as "inextricably intertwined" with Doe's other claims, which would permit us to exercise pendent jurisdiction over it. *Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1093-94 (9th Cir. 2007).

Our consideration of the fraud claim is also not " 'necessary to ensure meaningful review of' " the other questions that are properly before us. *Meredith v. Oregon*, 321 F.3d 807, 812 (9th Cir. 2003) (quoting *Swint v. Chambers County Comm'n*, 514 U.S. 35, 51 (1995)). We have held that decision of an issue is "necessary to ensure meaningful review of" another question only if the assertedly pendent issue provided the basis for the district court's jurisdiction to reach the otherwise appealable question. *Id.* (internal quotation marks omitted) (holding that review of *Younger* abstention decision was necessary to ensure meaningful review of the district court's grant of a preliminary injunction, because in the absence of its *Younger* holding, the district court would not have had jurisdiction to issue the injunction). The denial of the fraud claim in this case, in contrast, was not an essential precursor to the district court's determination that it had jurisdiction over Doe's other causes of action. For these reasons, I agree with the majority that the district court's dismissal of Doe's fraud claim is not properly before us.

At the same time, I entirely disagree with the majority's insistence that we lack jurisdiction to decide in full the question that the Holy See *has* appealed to us: whether the district court erred in denying immunity and exercising jurisdiction over all Doe's non-fraud causes of action. Doe argues in response that the district court's ruling should stand, because either the tortious act exception or the commercial activity exception applies and precludes immunity from suit.

As we have stated over and over again, we may affirm the district court on any ground raised below and supported by the record. *See, e.g.*, *Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 926 (9th Cir. 2003) (per curiam) ("We may affirm a district court's judgment on any ground supported by the record, whether or not the decision of the district court relied on the same grounds or reasoning we adopt."); *accord Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp.*, 159 F.3d 412, 418-19 (9th Cir. 1998); *Jackson v. S. Cal. Gas Co.*, 881 F.2d 638, 643 (9th Cir. 1989).

No cross-appeal is required — or appropriate — where we are being asked only to affirm the district court's judgment in full, albeit on a ground rejected by the district court. We have long held that an appellee is required to file a cross-appeal if he seeks "to support modification of the judgment." *Engleson v. Burlington N. R.R. Co.*, 972 F.2d 1038, 1041 (9th Cir. 1992) (internal quotation marks and citation omitted). In contrast, "arguments that support the judgment as entered can be made without a cross-appeal . . . even where the argument being raised has been explicitly rejected by the district court." *Id.* (internal quotation marks and citation omitted); *accord Gillam v. Nev. Power Co.*, 488 F.3d 1189, 1192 n.3 (9th Cir. 2007) (citing *Engleson*, and holding that an appellee did not need to cross-appeal to argue for a different standard of review than that used by the district court as an alternative ground for affirming the district court's judgment). In other words, "[s]o long as the appellee does not seek to 'enlarge' the rights it obtained under the district court judgment, or to

'lessen' the rights the appellant obtained under that judgment, appellee need not cross-appeal in order to present arguments supporting the judgment." *Rivero v. City & County of San Francisco*, 316 F.3d 857, 862 (9th Cir. 2002); *see also Lee v. Burlington N. Santa Fe Ry. Co.*, 245 F.3d 1102, 1107 (9th Cir. 2001) ("A prevailing party need not cross-petition to defend a judgment on any ground properly raised below, so long as that party seeks to preserve, and not to change, the judgment.").

So, if we conclude that the tortious act exception is insufficient to support jurisdiction over any of Doe's non-fraud claims, we may look to the commercial activity exception as an alternative ground on which to affirm the district court. Contrary to the majority's assertion, by doing so we would not be exercising jurisdiction over Doe's cross-appeal, in which Doe raises a commercial activity exception argument that would permit the exercise of jurisdiction over his fraud claim. Rather, we would be determining whether the record supports *affirmance* of the district court's order as to Doe's non-fraud claims, which is the subject of the Holy See's appeal. Put another way, Doe's cross-appeal asks us to " 'enlarge' the rights [he] obtained under the district court judgment," *Rivero*, 316 F.3d at 862, so the majority is quite right that we may not consider his arguments regarding the fraud claim. But Doe needed no cross-appeal to respond to the Holy See's appeal; Doe could — and did — respond by asking us simply to preserve the result that the district court reached, either by following the district court's reasoning or by a different rationale. Our case law clearly permits us to do so.

The majority concludes otherwise, maintaining that deciding the commercial activity issues involves review of a *grant* of immunity. *See* Maj. Op. at 2560-61, 2562 & n.5. But that is simply not so. The district court did decide that the commercial activity exception does not apply, but — except for the fraud cause of action — it did not grant immunity on that basis, as it concluded that there was another basis for denying

immunity. So the majority is just wrong when it states, repeatedly, that our reaching the commercial activity exception would entail reviewing a *grant* of immunity.

Moreover, I see no prudential reasons whatever for refusing to exercise our jurisdiction. The application of the commercial activity exception was fully litigated below, the district court decided the question, and the issue has been fully briefed and argued here. *See McClure v. Life Ins. Co. of N. Am.*, 84 F.3d 1129, 1133 (9th Cir. 1996) (holding that we can decline on appeal to affirm a summary judgment on grounds not relied on by the district court if the record is inadequate or the grounds not purely legal); *Badea v. Cox*, 931 F.2d 573, 575 n.2 (9th Cir. 1991) (declining to affirm the district court on an alternative basis "as a prudential matter," because the issue had not been briefed by the government, and raised a question of first impression in this Circuit) (internal quotation marks omitted).

The majority disagrees, maintaining that we should not exercise our prudential jurisdiction to support the district court's denial of immunity, because "a grant of immunity is not interlocutorily appealable at all." Maj. Op. at 2562 n.5. This reasoning, once more, mischaracterizes the state of play. The district court did not grant the Holy See immunity except with regard to the fraud cause of action; as to the rest of Doe's complaint, the district court denied immunity. The exercise of available jurisdiction is thus necessary to decide whether the district court's denial of immunity should stand. I would conclude that we have jurisdiction to decide the applicability of both the tortious act and commercial activity exceptions to the causes of action that are the subject of the Holy See's appeal — that is, all the causes of action alleged against the Holy See in Doe's complaint except for the fraud cause of action.

## II.    The Commercial Activity Exception

Given my view of the jurisdictional posture of the case, I would reach the merits of the commercial activity question and hold that, although the district court erred in applying the tortious act exception to preserve federal jurisdiction over Doe's non-fraud negligence claims, the district court's result should be affirmed on the alternative rationale that the commercial activity exception applies.[1]

As the majority explains, Doe's complaint sufficiently alleged an employment relationship between Ronan and the Holy See under Oregon law. Maj. Op. at 2572-75 (citing *Fearing v. Bucher*, 977 P.2d 1163 (Or. 1999)). For the reasons explained in greater detail below, I would hold that that relationship constitutes "commercial activity" for purposes of the FSIA.

Ronan was employed not as a member of the Vatican's diplomatic, civil service, or military personnel, the employment of whom we have held to be a quintessentially sovereign activity under the FSIA, but in a non-sovereign — here, religious — capacity. *See Holden v. Canadian Consulate*, 92 F.3d 918, 921 (9th Cir. 1996). Further, Doe's negligence claims are "based upon" the employment relationship between Ronan and the Holy See, as the FSIA requires. 28 U.S.C. § 1605(a)(2). Doe's negligent retention, supervision, and failure to warn causes of action against the Holy See therefore fall within FSIA's commercial activity exception, and the district court has jurisdiction to decide them.

---

[1]The discretionary function exclusion, 28 U.S.C. § 1605(a)(5)(A), and the misrepresentation exclusion, *id.* § 1605(a)(5)(B), only provide foreign states and their instrumentalities a safe harbor from the FSIA's tortious act exception, not from the commercial activity exception. *See Export Group v. Reef Indus., Inc.*, 54 F.3d 1466, 1477 (9th Cir. 1995).

## A.   The definition of "commercial activity" under the FSIA

The FSIA is often described as having codified the "restrictive" theory of sovereign immunity. *See, e.g.*, H.R. Rep. No. 94-1487, at 7 (1976); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 487 (1983). Under the restrictive theory, "a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts (*jure imperii*), but not as to those that are private or commercial in character (*jure gestionis*)." *Saudi Arabia v. Nelson*, 507 U.S. 349, 359-60 (1993). The Supreme Court has explained that a foreign state engages in "commercial" activities when it "do[es] not exercise powers peculiar to sovereigns," but rather "exercise[s] only those powers that can be exercised by private citizens." *Republic of Argentina v. Weltover*, 504 U.S. 607, 614 (1992) (alteration in original) (internal quotation marks omitted). Clarifying the statute's requirement that courts look not at the "purpose" of a foreign state's actions but rather at the "nature" of its actions, 28 U.S.C. § 1603(e), *Weltover* explained that "the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives," but whether the government's actions "are the *type* of actions by which a private party engages in" commerce. 504 U.S. at 614. The reason *why* the sovereign engages in that activity — its purpose or motive — is immaterial.

What is more, no profit need be made, or need even be possible, for the activity to qualify as "commercial." In *Weltover*, Argentina's issuance of bonds to refinance its debt was held to be "commercial activity," even though the consideration Argentina received for them was "in no way commensurate with [their] value." *Id.* at 616 (alteration in original). That fact, the Court held, "ma[de] no difference," because "[e]ngaging in a commercial act does not require the receipt of fair value, or even compliance with the common-law requirements of consideration." *Id.* Applying this understand-

ing, courts have found that non-profit organizations can engage in commercial activity. *See, e.g.*, *Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298, 314 (D. D.C. 2005) (holding that the loan of artwork by a Dutch non-profit museum to non-profit museums in the United States constitutes commercial activity, because exchanging artwork is an activity in which private individuals *can* engage, sometimes for profit).

In sum, a foreign state engages in commercial activity when it engages in acts that any private citizen has the power to undertake, regardless of the state's motive or the possibility of making a profit therefrom. Applying the *Weltover* definition of "commercial activity," this Circuit has repeatedly held that an employment relationship between a foreign sovereign and its employee constitutes commercial activity, so long as the employee is not a civil service, diplomatic, or military employee. In *Holden v. Canadian Consulate*, 92 F.3d 918 (9th Cir. 1996), for example, a former "Commercial Officer" in the "Trade and Investment Section" of the Canadian Consulate in San Francisco brought an action alleging that the Canadian government illegally discriminated against her on the basis of sex and age. *Id*. at 919-20. Examining the FSIA's legislative history, we noted that the House Report listed "the employment of diplomatic, civil service, or military personnel . . . by the Foreign state in the United States" as examples of acts that are "public or governmental and not commercial in nature." *Id*. at 921 (quoting H.R. Rep. No. 94-1487, at 16). In contrast, the "employment or engagement of [such other employees as] laborers, clerical staff or public relations or marketing agents would be . . . included within the definition of commercial activity." *Id.* (quoting H.R. Rep. No. 94-1487, at 16). Based on this legislative history, we held that employment "of diplomatic, civil service or military personnel is governmental and the employment of other personnel is commercial." *Id*.

We applied the *Holden* standard to the hiring of a domestic servant for a diplomat's residence in *Park v. Shin*, 313 F.3d

1138 (9th Cir. 2002). Park brought an action against the Deputy Consul General of the Korean Consulate in San Francisco, alleging that during her tenure as a domestic servant in the Deputy Consul General's home, the Deputy Consul General withheld her pay, denied her medical care, and confiscated her passport. *Id.* at 1140-41. We held that the commercial activity exception applied because "[t]he act of hiring a domestic servant is not an inherently public act that only a government could perform." *Id.* at 1145. Because the plaintiff's claims were based on an employment relationship with the defendant, the defendant was not entitled to sovereign immunity. *Id.*

## B.   The employment relationship between Ronan and the Holy See

Under this understanding of the phrase "commercial activity," Doe's negligence claims without doubt come within the commercial activity exception.

Doe's amended complaint explains that the Holy See has both "ecclesiastical" and "governmental" functions. In its governmental role, the Holy See undertakes certain functions that are undoubtedly sovereign. It maintains a volunteer military to defend the territory of Vatican City, over which it has complete control; it may enact laws with domestic effect and enter into international treaties and compacts with other nations; and it sends and receives diplomatic representatives to and from other states.[2] Under the analysis we set forth in *Holden*, had Ronan been employed to perform any of these "diplomatic, civil service, or military" functions, his employment by the Vatican would have fallen outside the FSIA's commercial activity exception. 92 F.3d at 921.

---

[2]*See* U.S. Dep't of State, Background Note: Holy See, July 2008, http://www.state.gov/r/pa/ei/bgn/3819.htm. Although these facts are not mentioned in the complaint, I take judicial notice of them pursuant to Fed. R. Evid. 201(b).

But, on the allegations in the complaint, Ronan was not a civil service, diplomatic, or military employee — the types of employees that only sovereign states can employ. Nor is there any evidence that Ronan was "privy to any governmental policy deliberations" or that he engaged in "legislative work" on behalf of the Holy See. *Id.* at 922. Rather, the Holy See hired Ronan to perform ecclesiastical and parochial services — to provide "religious and pastoral guidance, education and counseling services" to the Church's faithful. Providing religious, educational, and counseling services is not a peculiarly governmental function; it is something that non-governmental employers can do.

To reach this conclusion, I do not rely at all on the consideration that "churches receive financial support from their parishioners." Maj. Op. at 2561. The fact that Ronan's provision of pastoral services coincides with and depends upon his parishioners giving donations is neither necessary nor sufficient to show that the Holy See's employment of Ronan is a commercial activity under *Weltover*'s nature-not-purpose test. *Weltover*, 504 U.S. at 614. Instead, the critical factor in the commercial activity analysis in this case is that the Holy See's employment activities alleged in Doe's complaint are not distinctly *sovereign* in nature — that they are the sort of functions that private parties, not just sovereign governments, can perform. *See Holden*, 92 F.3d at 921. So approached, the application of the FSIA commercial activity exception to Doe's complaint is not an "arcane question," *see* Maj. Op. at 2561, but a straightforward matter of applying our own binding case law.

I recognize that the Holy See's dual role as not only a sovereign government but also the head of a worldwide church gives this case a peculiar complexion. But that sense of oddity comes about because the Holy See is a sovereign of a very unusual kind. Both in physical size and number of inhabitants, the land it governs is tiny. Its role as a traditional, sovereign government entity is correspondingly small, when compared

to its role in running an extremely large international religious organization.

The fact that the Holy See is unique among sovereigns in this respect does not, however, necessitate deviating from the rules we normally follow in construing and applying the FSIA. The operation of a huge international religious institution is a large task, and one of great importance to many people. But it is not an activity that may be undertaken only by *sovereign* states, which is the focus of the FSIA's commercial activity exception. Indeed, in most cases it is non-governmental entities, not governments, that operate international religious institutions, the Mormon Church and the Greek Orthodox Church being two prominent examples. The FSIA's purpose is not to insulate religious institutions from suit; it juxtaposes commercial activities not to *religious* activities, but to *governmental* activities. The Holy See differs from other foreign states in the *nature* of the non-sovereign activities it carries out and, in all likelihood, in the ratio of its non-sovereign activities to its sovereign activities. But it is like other sovereigns in the respect essential here: It engages in a range of non-sovereign activities in the United States, and the FSIA's commercial activity exception lifts the shield of immunity from such non-sovereign activities.

The district court nonetheless expressed discomfort with characterizing the Holy See's employment of Ronan as "commercial" activity for FSIA purposes, observing that the Holy See's employment of clergy is "widely viewed as the antithesis of commerciality." *Doe*, 434 F. Supp. 2d at 941. Commerciality and religiosity are, indeed, often viewed as antithetical categories. But, as I have explained, the FSIA's "commercial activity" phrase, as it has been interpreted in the case law, is a term of art, not reliant on common usage, which reflects the special concerns of a sovereign immunity statute. The district court's discomfort notwithstanding, under well-established FSIA principles and our own binding case law the employ-

ment relationship that existed between Ronan and the Holy See does constitute "commercial activity of a foreign state."

### C. Doe's negligence claims are "based upon" commercial activity

Under the FSIA's commercial activity exception, it is not enough for the plaintiff to show that the defendant engaged in something that qualifies as a commercial activity under the *Weltover* test. The plaintiff must also show that his cause of action is related to that commercial activity in one of three ways, depending upon the geographical location where the activity occurred. 28 U.S.C. § 1605(a)(2). In Clause 1 of § 1605(a)(2), the FSIA requires that if the foreign state's commercial activity is carried on inside the United States, the plaintiff's cause of action must be "based upon" that activity itself. Alternatively, if the commercial activity is not carried on inside the United States, the plaintiff's cause of action must be "[based] upon" an act performed inside the United States in connection with the commercial activity elsewhere, *id.* [Clause 2], or else "[based] upon" an act performed outside the United States in connection with commercial activity elsewhere that causes a "direct effect" in the United States. *Id.* [Clause 3]. Doe asserts that his claims may go forward under either Clause 1 or Clause 3 of the commercial activity exception.

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993), provides the leading interpretation of the FSIA's "based upon" requirement. *Nelson* explained that "[i]n denoting conduct that forms the 'basis,' or 'foundation,' for a claim, the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Id.* at 357 (internal citations omitted). As the district court here correctly noted, "[t]he commercial activity must do more than *lead to* the injuries plaintiff suffered"; it must be "involved in proving" one of the elements of plaintiff's cause of action. *Doe*, 434 F. Supp. 2d at 943 (quoting *Sun v. Tai-*

*wan*, 201 F.3d 1105, 1110 (9th Cir. 2000)) (internal quotations omitted).

Applying this standard, I would hold that Doe's negligence claims were "based upon" the Holy See's employment of Ronan within the meaning of the statute. The existence of that employment relationship is a necessary element of at least the negligent retention and supervision claims. *See Chesterman v. Barmon*, 82 Or. App. 1, 4 (1986) (in assessing whether plaintiff had sufficiently alleged a negligent retention claim, requiring that the individual who caused the harm be an "employee" of defendant). *See also* Restatement (Second) of Torts § 317 ("A master is under a duty to exercise reasonable care so to control his servant.")[3]; *accord DiPietro v. Lighthouse Ministries*, 159 Ohio App. 3d 766, 772 (2005) (holding that "[i]n order to prevail on a claim of negligent retention, plaintiff must establish . . . the existence of an employment relationship") (internal quotation marks and citation omitted).

Because Ronan's activities pursuant to the employment relationship occurred inside the United States, it may be that Clause 1 of the FSIA's commercial activity provision is satisfied: Arguably, the Holy See's alleged negligent acts were "based on" an employment relationship that, at least in part, was "carried on in the United States," as well as in Rome. 28 U.S.C. § 1605(a)(2) [Clause 1]. Whether or not Clause 1 applies, however, I think it quite clear that jurisdiction arises under § 1605(a)(2)'s Clause 3, regarding acts performed outside U.S. territory in connection with a foreign state's commercial activity that have a "direct effect" inside the United States. *Id.* [Clause 3].

Doe alleges that the Holy See participated in the decision

---

[3] I rely on the Restatement (Second) of Torts as evidence of Oregon law because it is frequently relied on by the Oregon Supreme Court in negligence cases. *See, e.g.*, *Wallach v. Allstate Ins. Co.*, 344 Or. 314, 320 (2008); *Bailey v. Lewis Farm, Inc.*, 343 Or. 276, 285 (2007).

to retain and reassign Ronan rather than terminating his employment, an act that we can infer was taken outside the United States in connection with Ronan's employment, and that had a direct effect in the United States — Ronan's ability to carry out his molestation of Doe. Taking his allegations as true, Doe has satisfied Clause 3 as to his negligent supervision and retention claims.

Determining whether Doe's "failure to warn" claim is based upon the alleged employment relationship requires looking to Oregon's "failure to warn" case law, of which there is relatively little. In general, under Oregon law, a defendant is not liable for a negligent omission that leads to a plaintiff being harmed by a third party unless the defendant has a "special relationship" either to the third party or to the plaintiff. *See* Restatement (Second) of Torts § 302 cmt. a. Such a special relationship may exist if, for example, the defendant "has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct." Restatement (Second) of Torts § 302B cmt. e(D); *cf. Brown v. Washington County*, 163 Or. App. 362 (1999) (holding that defendant could be held liable for failure to warn about the dangerousness of an inmate within its custody).

According to Doe's complaint, it was the Holy See's continued employment of Ronan in a position of authority that led to Doe's contact with Ronan, and thus to the Holy See's duty to warn Doe and the other parishioners about Ronan's abusive past and potential future dangerousness. So Doe's negligent failure to warn claim is also "based upon" a commercial activity, in that it is the result of non-sovereign actions undertaken elsewhere — the decision not to warn about an employee's dangerousness — with a "direct effect" in the United States. § 1605(a)(2) [Clause 3]. I would therefore hold that the district court has jurisdiction to decide it.

### D.  The "essence" of Doe's claims

Although the district court determined, as I would, that Doe's allegations satisfied the requirements of the commercial activity exception, it ultimately held the commercial activity exception inapplicable. *See Doe*, 434 F. Supp. 2d at 941-42. It did so because, following what it considered to be "the overarching principle in *Nelson*," it concluded that it could not "fairly characterize[ ] [the activities described in the complaint] as commercial." *Id.* at 947. Rather, it explained that "at the heart of plaintiff's complaint is the injury inflicted by a sexually abusive priest at plaintiff's church, a claim clearly sounding in tort." *Id.* at 942. On the district court's reading of *Nelson*, if the "essence" of a plaintiff's complaint sounds in tort, *id.*, the plaintiff's claims can proceed only under the FSIA's tortious act exception, or not at all.

The Sixth Circuit recently came to a similar conclusion in *O'Bryan v. Holy See*, Nos. 07-5078, 07-5163, 2009 WL 305342 (6th Cir. Feb. 10, 2009). *O'Bryan* held that, because the "true essence" or "gravamen" of the wrongful activities alleged in the plaintiff's complaint sounded like torts, the court could exercise jurisdiction over the Holy See only through the FSIA's tortious act exception. *O'Bryan*, 2009 WL 305342, at *11-12, 16-17. It therefore held the commercial activity exception inapplicable to the Holy See's employment activities.

I disagree that the arguably tortious "essence" of Doe's claims renders the commercial activity exception unavailable to him. Nothing in the FSIA suggests that the commercial activity exception and the tortious act exception are mutually exclusive and cannot possibly apply to the same conduct. Nor does *Nelson*, or any other controlling case, authorize reading such a requirement into the statute.

In *Nelson*, the plaintiff entered into an employment contract in the United States with a Saudi Arabian hospital operated by

the government of Saudi Arabia. 507 U.S. at 351-52. He then moved to Saudi Arabia, where he worked as an engineer for the hospital. *Id.* at 352. After he reported several safety violations to his superiors, he was arrested by the Saudi national police, imprisoned, and tortured. *Id.* at 352-53. He sued in U.S. federal court, alleging several intentional tort causes of action based on his imprisonment and torture, as well as a claim regarding the hospital's negligent failure to warn him, during the contract negotiations in the United States, that he would be subject to imprisonment and torture if he reported safety violations. *Id.* at 353-54. He argued that there was jurisdiction over his claims under the first clause of the commercial activity exception.

The Supreme Court concluded that there was no jurisdiction over any of his causes of action. His intentional tort claims could not proceed under the commercial activity exception because "a foreign state's exercise of the power of its police" is an act "which is peculiarly sovereign in nature," and therefore not "commercial" within the meaning of the FSIA. *Id.* at 361. As to the "failure to warn" claim, the Court concluded that the plaintiff could not meet the statute's requirement that his claim be "based upon the commercial activity" of Saudi Arabia merely by phrasing his claim in terms of the contract negotiations in the United States during which the failure to warn allegedly occurred. "[A] plaintiff could recast virtually any claim of intentional tort committed by sovereign act as a claim of failure to warn. . . . To give jurisdictional significance to this feint of language would effectively thwart the Act's manifest purpose." *Id.* at 363.

In analyzing the failure to warn claim, then, *Nelson* simply applied the general principle that the court does not accept a plaintiff's mischaracterization of the legal significance of the facts he has alleged, but will look "beyond the complaint's characterization to the conduct on which the claim is based." *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323

F.3d 1198, 1203 (9th Cir. 2003) (quoting *Mt. Homes, Inc. v. United States*, 912 F.2d 352, 356 (9th Cir. 1990)).[4]

Here, unlike in *Nelson*, Doe's negligent retention, supervision, and failure to warn claims are not simply a "feint of language" to obtain jurisdiction through the commercial activity exception. *Nelson*, 507 U.S. at 363. Doe has alleged that the Holy See continued to employee Ronan, and placed him in the Archdiocese where he molested Doe, even after the Holy See was aware that Ronan had molested young boys on at least two prior occasions while in its employ. He has alleged further that the Holy See did not inform Doe or his parents of what it knew about Ronan's dangerousness, despite its position of trust with respect to Doe and its employment relationship with Ronan. Doe's negligence claims are not a mischaracterization of the factual allegations he has made, but are in fact among the central wrongs he alleges.[5]

---

[4]For example, if a plaintiff has alleged conduct that clearly amounts to false arrest, but has called his claim one for "false imprisonment," the court will not simply accept that latter characterization. *Blaxland*, 323 F.3d at 1204-06.

[5]Nor does our decision in *Randolph v. Budget Rent-A-Car*, 97 F.3d 319 (9th Cir. 1996), require any different result. *Randolph* concerned a Saudi student trainee studying in the United States on a scholarship from Saudia airlines, an instrumentality of the Saudi government. *Id.* at 327. While living in this country, the student "negligently crashed his rented automobile into John Randolph's motorcycle." *Id.* at 323. We held that Randolph's respondeat superior claims against Saudia could not come within the tortious act exception to the FSIA because the student was not an "employee" of Saudia. *Id.* at 325-29. Addressing the commercial activity exception, we concluded that the lack of an employment relationship meant that the allegations simply had no nexus to any commercial activity of Saudia: "[N]ot only must the activity be commercial in nature, but the commercial activity must cause the harm alleged. . . . The specific acts of which plaintiff complains did not arise out of Saudia's commercial activity in the United States." *Id.* at 324.

We also observed that "plaintiffs' personal injury lawsuit sounds in tort and centers on the non-commercial negligence of a purported employee." *Id.* This observation, however, must be considered in the context of the

In summary, I see no reason why claims arising from actions with an arguably tortious "essence" cannot proceed under the commercial activity exception. As noted above, the phrase "commercial activity" in the FSIA is a term of art. Neither the statute, nor any controlling case, requires the conclusion that the commercial activity exception is necessarily inapplicable whenever the label "tort" would be, in common usage, a better description of the harms a plaintiff alleges.

## E.   The Holy See's First Amendment argument

The Holy See contends that reading the FSIA to allow federal jurisdiction over Doe's claims via the commercial activity exception would violate the First Amendment, because adjudicating the case will require the judicial interpretation of such religious doctrine as the vow of obedience that members of the clergy offer to the Pope. This contention cannot get off the ground because, as a foreign sovereign, the Holy See has no rights under the First Amendment.[6]

Neither we nor the Supreme Court have previously addressed whether foreign sovereigns enjoy the benefit of any rights under the Constitution of the United States. *Cf. Weltover*, 504 U.S. at 619 (leaving open the question whether foreign states enjoy rights under the due process clause). The D.C. Circuit, however, has concluded that foreign sovereigns are not entitled to rights under the due process clause of the

conclusion that there was no employment relationship between Saudia and the student. In the absence of such a connection, there was only the tort of negligent driving by a student unconnected to Saudia, and no "commercial activity." In this case, in contrast, Doe has clearly alleged an employment relationship between the Holy See and Ronan and a nexus between the employment relationship and the harm he suffered. That relationship supplies the commercial activity missing in *Randolph*.

[6]The Archdiocese, the Catholic Bishop, and the Order, which are not foreign sovereigns and are residents of the United States, are, of course, entitled to First Amendment protections.

Fifth Amendment, and much of its reasoning on that question is relevant here. *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002).

The D.C. Circuit explained that foreign sovereign nations are not members of the political community for whose benefit the Bill of Rights was adopted. They "are entirely alien to our constitutional system," *id.*, and so the protections to which they are entitled have traditionally been governed not by domestic constitutional law, but by international law. *Id.* at 97; *see also Principality of Monaco v. Mississippi*, 292 U.S. 313, 330 (1934) (foreign sovereigns are "outside the structure of the Union."). Unlike private individuals, "sovereign states interact with each other through diplomacy and even coercion in ways not affected by constitutional protections." *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 202 (D.C. Cir. 2001). They also have recourse to international dispute-resolution mechanisms to which private individuals have no access. Indeed, the FSIA is in part a recognition that grievances against foreign states are sometimes better resolved in these other arenas, not in U.S. courts. In this context, there seems no basis for extending constitutional protections to foreign states in their capacity as such. *Accord O'Bryan v. Holy See*, 471 F. Supp. 2d 784, 794 (W.D. Ky. 2007) (the "Holy See cannot simultaneously seek the protections of the FSIA and the United States Constitution.").

In addition, as the D.C. Circuit observed in *Price*, "serious practical problems might arise were we to hold that foreign states may cloak themselves in the protections of the" Constitution. *Price*, 294 F.3d at 99. It would be thoroughly anomalous to permit the executive branch to be constrained in its conduct of foreign relations by assertions by foreign sovereigns of entitlement to the protections of the First Amendment. I would therefore reject the Holy See's contention that foreign sovereigns have First Amendment rights under the U.S. Constitution, holding that the district court's exercise of

jurisdiction over Doe's claims presents no First Amendment concerns.

## III.  CONCLUSION

For the foregoing reasons, I would affirm the district court's judgment, holding that the FSIA's commercial activity exception permits it to exercise jurisdiction over Doe's non-fraud negligence claims.

---

FERNANDEZ, Circuit Judge, concurring:

I agree that we cannot consider the commercial exception to the Foreign Sovereign Immunities Act, 28 USC § 1605(a)(2). But, Judge Berzon does not and has, therefore, gone on to opine that all (or virtually all) activities by churches are actually commercial activity. While I recognize that her opinion cannot be precedential and that a response from me cannot be either, I am loath to leave her disquisition standing alone. Thus, I cannot (or at least will not) refrain from offering my own view on the rather oxymoronic proposition that church functions are commercial.

As I see it, Doe's claim that church functions are simply commercial transactions because parishioners do give donations to the church bespeaks the veriest cynicism about religion and a church's position within religion.[1] Could a church spread the word of God without some funds? Would that it could, but the need for support does not mean that the holy activity is commercial. Is the Mass the marketing of a form of edifying entertainment? Is hearing confessions and giving religious advice — an age-old function of churches — really no more than a commercial activity similar to psychological

---

[1] It may be suggested that whether parishioners donate matters not at all. If so, the result is even more jarring than Doe's proposition.

counseling? Is the sacrament of Holy Eucharist the marketing of bread and wine or is the sacrament of Extreme Unction the marketing of oil? I think not. Normal legal usage and common sense recoil from those possibilities. *See United States v. Lamont*, 330 F.3d 1249, 1254-55 (9th Cir. 2003).

Nor does the statute or the case law suggest that the Holy See's religious activities must be commercial. The FSIA tells us that "[a] 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). That does not help much, but it also does not say that every possibly private activity is commercial. It says only that commercial behavior is commercial activity. As the Supreme Court has, somewhat more helpfully, stated:

> [W]e conclude that when a foreign government acts, not as a regulator of a market, but in the manner of private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA. Moreover, because the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose" . . . , the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs . . . are the *type* of actions by which a private party engages in "trade and traffic or commerce[.]"

*Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 614, 112 S. Ct. 2160, 2166, 119 L. Ed. 2d 394 (1992) (citations omitted). Some have focused on the "private player" language, but what is truly significant is the emphasis on the market and on "trade and traffic or commerce." *Id.*

I fail to see how engaging in providing religious counseling is "trade and traffic or commerce." *Id.* Nor, by the way, can a mere private actor give priestly counseling or consolation to a believer. This does not require a focus on purpose; it goes to the very nature of the religious activity itself. Similarly, we have noted that: "[t]he commercial activity exception applies only where the sovereign acts 'in the market in the manner of a private player.' " *Holden v. Canadian Consulate*, 92 F.3d 918, 920 (9th Cir. 1996). Again, Holy See has not acted in the market at all. It has simply supplied religious counseling to a church communant, a service that this unique sovereign entity is designed for.[2]

I think that the problem this case seems to present lies in the fact that Holy See is an unusual type of foreign sovereign. Most governments do, indeed, exist to afford their citizens a degree of physical protection and guidance, so that they may thrive in this world. Holy See is more focused on the next world, and that makes a universe of difference. Because of that, Holy See's sovereign activities are not simply the passage of mortal laws and the enforcement of those. They, basically, encompass the furnishing of the kinds of services that only Holy See can give: its own kind of religious help, guidance and counseling. It may do more than most sovereigns do, but it is not engaged in the market or in commerce.[3]

In short, Holy See may not be your typical sovereign, but neither is it your typical merchant. Does that lead to some kind of impasse? Of course not. It leads back to the statute

---

[2]Similarly, Father Ronan was not simply supplying commercial advice and services, nor was he a domestic servant. *Cf. Park v. Shin*, 313 F.3d 1138, 1140-41 (9th Cir. 2002) (domestic servant service); *Holden*, 92 F.3d at 919 (commercial officer). Rather, he held his position for the purpose of giving the very kind of ecclesiastical services to the faithful that lie at the heart of this sovereign's reason for being.

[3]That is not to say that Holy See could not participate in commercial activities. It is only to say that the activities of the type that are involved here cannot be so dubbed.

itself. Holy See is a foreign state and the commercial activity exception does not strip its immunity from it. Something else may do so, but not that exception.[4] We hierophants of the law are adept at redefining ordinary concepts, but it is no more appropriate to declare that religious services are commercial activities than it would be to declare that ponies are small birds.[5]

Therefore, if we had jurisdiction I would not apply the commercial activity exception to this case.

---

[4]The Sixth Circuit has reached the same result but for different reasons. *See O'Bryan v. Holy See*, ___ F.3d ___, ___, Nos. 07-5078, 07-5163, 2009 WL 305342, at *9-12 (6th Cir. Feb. 10, 2009). So, too, did the district court in this case. *See Doe v. Holy See*, 434 F. Supp. 2d 925, 946-47 (D. Or. 2006).

[5]*See Regina v. Ojibway*, 8 Crim. L.Q. 137 (Oct. 1965).